Good morning, everyone. We have five cases on the calendar today. Three are being argued. The first two cases are Lehman Brothers cases that we're hearing in tandem. So we'll hear the argument on those cases. We'll hear together. We'll combine the time and give 20 minutes to each side. So if the attorneys for Lehman Brothers, we have the case 19-3245, which is 344 individuals versus Giddens, and 20-3757, Giddens versus Lehman Brothers Inc. Come forward. Okay, go ahead. May I please implore Rick Skrula for the appellants to consolidate the first ten cases? This is an unusual posture, especially for the second of the two appeals I'll call the substantive appeal. And I'd like to address those issues first, because I think they're the heart of the matter. As the papers reflect, the trustee has in opposition to our appeal advanced a theory as to why this court should affirm, which is entirely missing from the papers below. It's entirely missing from the bankruptcy court's decision below that's being reviewed here. It's essentially saying that, well, really, even though we said to the court below that this statute, 541B7, is only about individual bankruptcies, not corporate bankruptcies, 180-degree turn is taken. And in this court now, in opposition, the trustee is arguing, no, actually, we figured out and took a look at some old legislative history and we've decided that what it means is this statute is only addressed to in-transit funds, funds that are held by an employer, not by the individual bankers, but by an employer at a time when an employer goes bankrupt and is holding a handshake, passing on to someone else. So there are numerous problems with that argument. Well, the first problem, and I hope I'm interested in your views on it, is that the terms of this top hat plan are quite explicit, that you're unsecured, that the money is Lehman Brothers money, it's in Lehman Brothers' own bank account, and in light of what would appear to me to be some unambiguous terms in the plan, you're now telling us that a security interest has arisen. So I don't quite get that. Well, that was a 1986 contract, Your Honor, and it did say exactly essentially what Your Honor just stated. But in 2005, Congress passed a statute, and in that statute it said that in the event of a bankruptcy in the defined group of pension funds, the pension funds would be treated as outside the estate. But that doesn't make them secured. That doesn't make them secured. If 541 applied, it would be outside the estate. 541 doesn't talk about secured or unsecured. I mean, that's the other appeal where we're appealing from Judge Gardner's decision. But even if that were to stand, even if you treat them as not secured, then the other appeal is simply to say the other way of looking at it, which could have been addressed by the trustee or by our clients before we were in the case 12 years ago, is simply that under 541b-7, these funds are outside the vacancies. What about the fact that the first time you raised this new theory is in 2019? For years and years and years, you were arguing in the bankruptcy court to this court, we had subordination issues with secured versus unsecured, and then for the first time, you can correct me if I'm wrong, but the first time in 2019, you're now arguing it's outside the bankruptcy estate. Why was the bankruptcy court wrong to say that either statute of limitations or laxity should apply to that type of argument when 11 years have gone by? There are a whole host of issues in embracing what you said. First off, in 2009, proofs of claim were filed by a prominent bankruptcy firm. They disappeared from the case, and they disappeared from involvement around 2011. I can't speak to why they made the choice that they did. Well, yes, you can because you're stuck with the decisions they made and more to the point with the representations they made to the bankruptcy judge, to the district court, and to this court. The proof of claim does state, it refers to it, it is deemed to be outside of the estate. The proof of claim says it's a secured claim. It states it as a secured claim, and it talks about 541B7. It invokes the correct statute and it references property outside the estate. The next time anybody addressed that subject, and I can't say I would have done it the same way if I was God and knew everything in 2008 or 2009, but I wasn't there.  In this instance, Jared, I think you have to take it in the context of the largest bankruptcy in history. 344 individuals… We don't know about Lehman Brothers. We've lived with Lehman Brothers for 20 years. And 344 individual clients lost their pension rights for the last 13 years because of it. It's a very high standard placed on them to have knowledge of all of the right paths. It's amazing that they've even been able to consolidate themselves and act as one group, and then again reconsolidate in 2014 when subordination efforts started, when we became involved. But the statute was invoked, and if it was invoked, then under the – in connection with what I'll call the procedural appeal, we don't think a proper motion was ever made. It's on the docket, in fact, for 12655, the trustee's brief. It does not say a word about 541B7. Well, but what is the way in which that kind of claim should be raised? Isn't the right answer what you did, which is to file an adversary proceeding? That's what – I think it was raised properly. If I were there knowing everything I know right now in 2009, I'd have raised it as an adversary proceeding. Well, yes, I understand what you're saying. I understand what you're saying, that this was the result perhaps of former counsel's mistake. But clients – these are not pro se litigants. These are people who had, as you said, a prominent bankruptcy firm advising them. Maybe that – just because they're prominent doesn't mean they didn't commit malpractice or do something wrong or make a mistake. But they did what they did, and what they did was not to file an adversary proceeding. And then you come along. Not to criticize you. I mean you're trying to protect your clients against whatever happened before. And you bring an adversary proceeding. But then there's a problem with is this proceeding barred by the statute of limitations? Well, let me talk about latches and statute of limitations. It has background. It was first raised by the trustees in 2015, seven years into the bankruptcy. Practically speaking, given the size and breadth of the leading bankruptcy, they didn't deal with anything other than customer claims, and they say so in their papers, until the end of 2012, at which point the statute of limitations fell when you brought it. Well, but the fact – you know, I'm not sure that you get out from under the statute of limitations by saying that the court was too busy to have gotten to it anyway if it had been raised. Excuse me. I'm asking a question. I'm not sure you get out from under the statute of limitations by saying that the court was so busy that if it had been raised at the proper time and the proper way, the court wouldn't have gotten to it anyway because it was dealing with other stuff. And so now we can bring an adversary proceeding belatedly. We're not doing it belatedly. I'll explain what I meant to say. It is, in fact, the case. We're not making any kind of a stop law argument. The argument is that the statute of limitation never applied, doesn't apply. They're invoking 1658A, as we've discussed in the papers, 30 years, 31 statutes passed in 1990. It's never been applied to a bankruptcy case. And your theory is that a bankruptcy case is not a civil action. That's your theory? That's one of the two things. What is it if it's not a civil action? It's a sui generis bankruptcy process. That tells me nothing. It tells you that it's not intended, I submit, to be subject to the cash-off 1658A provision that the legislative history tells you mentions nothing about bankruptcy. It was there to deal with federal claims. Some prominent examples were some civil rights claims that had no embedded statute of limitation. And the mess resulted because each federal district court dealing with it had to look to a state court and borrow a statute of limitation. This would make sense if we still had a distinction between law and equity. And you said, well, a civil action or actions of law and bankruptcy is really an equitable-type proceeding. But that went out in 1930-whatever with the Federal Rules of Civil Procedure. There's one action, a civil action. It happens that in the bankruptcy court. It is labeled an adversary proceeding. It happens in bankruptcy rather than in the district court. But isn't it still a claim that's being raised in federal courts that's within the meaning of that statute of limitations? I don't think that that's what the words civil action mean. Could you explain why? But there's even – the argument even before that is 1658 says except as otherwise provided in other law. And what otherwise – what other statute of limitations applies? It's not another statute of limitations. It's in other law. The other law is existing bankruptcy in 1990, which we cited, said expressly these kinds of claims don't – these kinds of issues, I should say. Determining a status in bankruptcy court of whose property it is are not subject to a statute of limitation. That was the law. It's in Williamson's Infantain and under Section 542 of the Turnover Proceedings, which is really a trustee's right. Today, the trustee could start a new proceeding for turnover subject to no statute of limitation 13 years later. If the money had not been in its hands but in our hands or in the third party's hands, under existing law, I don't think the trustee would disagree with us. Today, 13 years later, the trustee can say, oh, I'm going to go get that now under Section 542 as a turnover proceeding. So what the cases that tell you there was no statute of limitations applying to these inside-the-estate or out-of-the-estate property determinations are significant for here is that the existing law in 1990 is that there's just no statute of limitations intended in bankruptcy law for these. Mr. Skrola, even if there were no – even if that statute didn't apply, the same reasoning would apply under Latches. All the – the reasoning with respect to the delay, with respect to the prejudice of – The changing positions of multiple changes. Yeah, the litigating, the time, the money that went into litigating secured versus unsecured, subordinated versus unsubordinated for years and years and years, and the bankruptcy court now being held up by a new theory that was being asserted for the first time, citing the statute isn't enough to say we asserted this theory. You have to point to us any time in the bankruptcy proceedings, at any point, that this theory that it's outside the estate was ever raised before 2019, ever. It's stated down in the face of the proof of claim. Because you put the statute – because you put the statute in? Not you, but – It actually uses the words outside the estate, and the first time the trustee reacts to it is in 2015. And in 2015 – I mean, I have the e-mails with me. Still four years went by. An adversary proceeding could have been brought in 2015. Well, actually what happened is they made a motion that wasn't really a motion. They made a motion that said we have determined that this doesn't – by the way, at this point, if the statute of limitation applies, the ship is safe. So it's important. It's three years ago. When they say these are unsecured claims, why wouldn't the lawyer for your client say, wait a second, these are outside the bankruptcy estate completely and bring an adversary proceeding? Once they say these are unsecured claims, right? When you say they're secured claims, you're saying they are – you are making a claim against the bankruptcy estate when you do that. It's arguing in the alternative. In 2015 – Well, wait, there was no argument in the alternative. They said, kind of like what you said in the other case that's before us, that because this is subject to this section of the bankruptcy code, that makes it a quasi-secured claim. And that's an argument that you were still pressing in the bankruptcy court earlier. But there was not any pleading that I could see that said back in the beginning, we're saying either this is outside the estate because it's subject to Section 541 or it is a secured claim or should be treated as a secured claim. They filed a secured claim. That's what they did. There's no doubt that did not happen in 2000. You're right. But in 2015, at a point when our firm had a limited representation for the subordination proceeding, limited notice of appearance, as you already mentioned, because they grazed that in 2013, Mr. Fitzpatrick calls me and says, we'd like to take these down from secured to unsecured. I asked him what's that about. He doesn't say. It's referenced in the record in the Appeal from Discard, page 899 to 102, it's in the Declaration, at which point they made the motion. And they still don't address the need to make it secure. When do you think these claims became unsecured, crossed the bar from becoming secured to unsecured? How did that happen? Walk me through it. I'm not understanding the question. You follow the proof of claim, describing these initially as secured claims. Now you're pressing the point that they're really unsecured. Right? No, I'm pressing the point that they're outside the estate, which is the alternative way of looking at it. That being outside of the estate under Article 81B7 is the equivalent of having a secured interest. So that filing it that way, prior counsel in 2009, did not make a mistake. It gets you to the same place, whether it's treated as traditionally safe or outside the estate. You have a superior interest to that. Let me ask you this. How much money are we talking about? $270 million. Okay, and how much of that represents interest and how much of it is – how much is compounded interest and how much is the contributions that these executives – not the contributions, the compensation that they were paid? I don't have a calculation of the amount. Roughly. The $270 was capped as of the time of the bankruptcy in 2008. The trustees represented in its papers that the amount is somewhere around – I want to say, I think they said 80 percent, 85 percent is interest over the period. Okay, and the – refresh me as to how this worked. Once the deferred contributions were set aside and they accrued interest, it was 11 percent? Yes. Who paid them? It was the accrual of the plan that the plan sponsor, which was initially Shearson, later became the FBI, was obligated to pay those folks. So the way this top hat plan worked, a buck was deferred. It accrued interest. Was this interest a responsibility of Lehman Brothers, of Shearson-Lehman Brothers? In other words, were they responsible for paying the interest? Yes. So let's say you lose. Do you have an unsecured claim in the amount of $280 million? No, because they've argued and succeeded on a separate ground to say that if you are inside the estate, your claims are subordinated to the general unsecured creditors and in this bankruptcy. So you become – or if you lose, you come behind the general unsecured creditors? Today there's no question that that's zero. I want to ask a question about the merits, and we've gone longer than the time, so I want to make sure we at least get to this. The statute that you're referring to and that you're relying on that Congress passed that changed the bankruptcy status of pension plans refers to pension plans that are subject to Title I of ERISA. It doesn't say plans that are subject to some provisions of Title I of ERISA, but it also doesn't say plans that are subject to all of the provisions of Title I of ERISA. So what are we to make of that? How are we to – why do you say that a plan that is subject to certain provisions of Title I, but that is designed – the whole point of a top-hat plan is that it is not subject to some of the most important provisions of Title I of ERISA, is nevertheless covered by this bankruptcy statute? There are two parts to the answer. One is that when you're subject to something – this is a more textual, generic answer – if you're subject to something, you're subject to the fact that you're exempted from part of it because you don't get certain protections. Well, I'm not – yeah, I understand that argument, but it's – excuse me. I understand that argument, but it's a little difficult for me to follow. If I say subject to the provisions of part six of this contract, I'm saying that whatever is subject to it is subject to all of it. And here we have something that is not only not subject to all of Title I, but going back again to the original construction of the plan, the whole point of a top-hat plan is that it is not the same kind of pension plan as most of the pension plans that are subject to Title I, and it is not subject not just to one or two things that it's exempted from. It's not subject to the basic protections that would otherwise rationalize why Congress gave pension plans the bankruptcy status that it did. At the time, 2005, when the statute was passed – this is the second part of my answer – I think textually I argue it differently. You are subject to it. Then you get some exemptions, but there's a definition of what's subject. No question that this plan is covered. Some other parts of the statute create exemptions for certain kinds of plans because basically they're saying these individuals don't need a certain protection. That's – I think that's the analysis. You're still subject to it, but you – really, your client's sponsor is going to get some free rides. But the second part is in 2005, Congress is fully apprised of how these plans are discussed, described, and treated. The trustee cites nothing that says these are cases – that these are plans that aren't subject to Title I ERISA. We cite all of the law that explains that they are, that that was the verbiage consistent with the landscape that Congress was writing against when it wrote that statute. If it intended anything other than to cover these plans, which in many cases said, of course, they're subject to ERISA, it would have said so, and it didn't. All of the cases that you cite in which a court says a Top Hat plan is subject to Title I of ERISA are actually saying – the actual language of them, and I'm not just inferring, are saying they are subject to particular provisions of Title I of ERISA. Also true because the exemptions exist, but if you're going to construe a statute to say you're implying that it doesn't apply here because there are some exemptions here, it's illogical to think Congress wouldn't have spelled that out if that were the intent. But I can go one step beyond that. The whole crux of it is these are unfunded, deferred compensation plans. That's the reason why there's such angst about the idea that they could be subject to the 541B7 protection. But just read one paragraph down to Roman 2, and it says deferred compensation plans under Section 457. Now, what those are are non-profit plans because they weren't embraced within ERISA, but they are no different. They are unfunded. In every material respect, they are the same as the ESEP plan here. So in the very next sentence, Congress says specifically that we're including those. So it's a further reason why it's a huge drafting error to infer that Congress really meant this exception when it didn't say it, but in the next sentence says the opposite as a matter of policy. Okay. I take your point. Can I come back to 2015 on point? You're way over time. I'll give you 30 seconds because you also have rebuttal time. All right. This is on the license issue. I mean, I hope – I understand the court's grip, but I hope to take this into account. In 2015, this was not the last case. We were just getting started. The trustee was just getting started in 2013 after dealing with the civil brokerage claims through 2012. In 2015, they made a motion we think it was improper. It didn't even spell out the reason. It didn't address 541B7. Substantively, the one that I think they didn't address in their motion, procedurally, this dichotomy of is it inside the estate or is it superior or is it outside the estate. Right. I think Mr. Skrola – Except we had to determine. Mr. Skrola, you made that point. So in 2015, we took the proper procedural appeal to move it forward, and it took four years to be decided. You made that point. Mr. Skrola, you made that point earlier. So let's give them a chance, and you have your rebuttal time. Thank you. Thank you. Mr. Fitzpatrick. Good morning, Your Honor. It's my pleasure to support Chief Fitzpatrick from his suburb within the trustee. If I could start briefly with the first appeal on the calendar, 19-3245. The only issue in that appeal is whether or not these funds are secure. With respect to that, this court has already held in a prior case in this litigation that the claims were supported. And in doing so, the court found in terms of the ESAP agreements, as Your Honor referred to before, unambiguous and binding. The same language that says those claims are supported also says they're unsupported. So respectfully, with respect to the first issue of whether or not the claims are supported, there's really no issue there. I may be missing it, but you're not arguing confusion, are you? You're not arguing that the point that's raised in this appeal you just referenced has already been decided by this court. I'm not saying that it was explicitly decided because the issue in that case was subordinated versus unsubordinated, and claims can't be both subordinated and secured. You're saying this would – we would be contradicting that prior – I was on that panel. This would be contradicting that prior decision because we concluded that these were subordinated to general unsecured creditors. So how could they be secured, right? That's correct. By definition, they can't be secured then. Correct, Your Honor. And I'm just adding to that, not just contradicting the holding but also contradicting the reasoning because the basis for that decision was the binding unambiguous terms of the agreement, which in the same sentence that it said they were subordinated also said they were unsupported. Their argument is that Section 541B7 just basically trumps all of that now. And that's the subject of the second appeal. I'll turn to that now. I just wanted to – for the first appeal, there's no issue. They're not – they're clear. Yeah, I think the first – I wouldn't say Mr. Skorla has abandoned that point, but really the focus is on – if the plans are not subject to 541, then that would, it seems to me, kill both arguments, right? There's a separate set of problems even if it is subject to 541. There's no such thing that I can find in the Bankruptcy Code as a quasi-secured or kind of secured claim. It's either a secured claim or it's not. And besides that, if 541 applies, it makes it not a claim against the estate but something different. So really the action here is in that second appeal, I would think. Is that the point you're making? Yeah. So I just wanted to put the first appeal to the side, and I can return to the second appeal where the relevant issue is. And with respect to that, I do take issue with the fact that we've abandoned our prior arguments or done the bad things. It is true, and we're very clear about this in the group, we located additional legislative history under the Bankruptcy case. And I will turn to that in a moment. But our argument has always been, and this is the argument that the Bankruptcy Court adopted in her Honor's decision, is that 541d7 does not and cannot mean what they say it does. It cannot take top-hat plan funds and put them outside the estate because it would conflict with ERISA and taxes. And let me start with the language of the statute, because, of course, that's where we have to start. The plain language of the statute, and I will agree this is not a very far-fetched statute, but they are wrong if the plain language of the statute supports them. The language does not say funds in a plan are outside of the estate. The language says, amounts withheld or received by an employer from the wages of an employee for payment as contributions to a plan. And it also says, a plan subject to Title I of ERISA, which, as Your Honor correctly noted, the important provisions of Title I of ERISA, these plans are not subject to. They are specifically exempted from them if they are unfunded. And so, at the very least, the language of the statute is ambiguous. In fact, we argue that when you turn to the legislative history, that the reason it's drafted that way is because they were worried about funds in transit to a plan. But it's at the very least ambiguous. And then if we turn to what – and this has always been the crux of our argument – it can't be what they say. Because – and the reason for that is ERISA specifically exempts top-hat plans. It contemplates them and exempts them from the substantive provisions if they're unfunded. The definition of unfunded, this Court has held in Demery and other courts have held, unfunded means you can't have more of a right to it than the general creditor's effect. So if 541B7 means what they say it does, then all of the plan participants have a super-priority right in bankruptcy, and top-hat plans are outwitted. And the same applies to the tax law because property, under Section 83 of the Internal Revenue Code, and the relevant language is 1-83. Property does not include an unsecured, unfunded promise to tax. The whole reason the tax deferral works is because the top-hat plans are unfunded. And again, as this Court has held, unfunded means you can't have more of a right to a fictional premise. And that has always been our argument. That was the argument that the Bankruptcy Court accepted. That's what's – that argument has been the crux of what several of the lower courts that have addressed this very issue have troubled them, and they've uniformly held that 541B7 doesn't apply. So that has never been consistent. Now, let me turn to – we did – I'm completely candid. We found more legislative history than we did before the Bankruptcy Court. And we laid that out in the brief. And when you trace it, it's actually clear that what – the impetus for this statute was the Bankruptcy Review Commission report in 1997. And they – what they were saying is we want to make sure that funds that are held by the employer to be paid over, but then get trapped with the employer when they file for bankruptcy. Those shouldn't be part of the estate. Those should go to the plan for which they were intended. The Senate agreed. Senator Grassley was very specific in the record when he proposed that bill. That's what he was doing. And then it is true that that bill doesn't get passed. This legislation, they try to pass it every year. It either doesn't pass or it gets pocket vetoed. But finally, in 2005, it becomes that CFA. And this is the statute. But if you trace it back to 1997, they were worried about funds in transit. I will say the claimants point to a different section of the Review Commission report that had to do with individual bankruptcies. That has nothing to do with 541B7. That was codified in a different section of the statute related to individual bankruptcies. They also argue that there's a break in the chain between the 1997 review report and the ultimate statute and that a housed version of the bill took different things into account. But as we point to in our brief, and they don't respond to this, after that alleged break in the chain, there's a Senate report in December of 2000 where they, again, confirm this language is not meant to apply to funds that are already in the plan. So, again, confirming that what they were worried about was funds in transit. And it also follows that what they were worried about was actual qualified plans under Title I of the RISD because you wouldn't worry about funds in transit to a top-hat plan because they're not protected once they get there anyway. What you worry about is funds that are in transit to a 401K where they would be protected, everybody agrees, once they got there. And so, again, I think the issue is the fact that we've been inconsistent. I think we've been very consistent from day one that it can't mean what they say it means. The issue is that we found some more legislative history, which, frankly, it went back to 1997, and no court or secondary source had cited it before, and we didn't find it the first time, but we found it now and felt that we should present it to you guys. And so those are my points on the merits of 531B7. I think on latches and statute of limitations, I think we've made our position clear on the paper. The only thing I would add to that is that, you know, we spent a lot of time talking about the original proof of claim back in 2008 and the fact that that was not a claim to funds in the estate at a secure time. But I think we also can't lose sight of the fact that since 2013, including multiple trips to this court, we've been litigated, the same counsel, the same everything has been litigated. And when we moved to subordinate these claims, there was never an opposition that said, wait, they're not subordinated, they're not subordinated, they're not even in the estate. That argument was never made. So we were fighting over the difference between zero, which is what they said they would get if they claimed they're subordinated, and a generalistic effect, $0.40 on the dollar. At no point, at no point did they say, and if they had, this issue would have been resolved years ago. At no point did they say, hold on, no, we get $0.10 on the dollar. They're not even in the estate. And I think that's another essential consideration. I think it was an essential consideration. Can I ask a question about the statute of limitations, apart from the laches? Mr. Sklarola says that the general statute of limitations that Congress eventually passed for all federal claims in every civil action, unless there's a specific statute that applies, the sort of residual statute of limitations, just simply has no application in bankruptcy. And he further said that there's never been a case that found that it applies. First of all, is the latter right? And then secondly, could you address the general point? To the best of our knowledge, we have not found a case that addresses the issue one way or another. It's never been found to apply. It's never been found not to apply. I believe the reason is the timing, that it only applies to statutes that were passed after 1990. And so all of the cases that they cite, where there was no statute of limitations applied, this statute couldn't have applied to them by its terms. Those cases deal with whether other statutes of limitations apply to other statutes. But there's never been a case that's addressed one way or the other, whether it applies to 541B7. The reason we submit that it makes perfect sense is that the way they're claiming 541B7 operates, is that basically the estate has your property. You think it's yours, but the estate is holding it. And it shouldn't even be in the estate. I don't think there's anything wrong with, I mean, if someone else has your property, I don't think there's anything wrong with it being a statute in effect that says you have four years to make that claim. And I think that's what Congress, I think that's what the plain language of the statute would have been. Because it's a claim based on a federal statute, namely in this instance Section 541. It was passed after 1990, and there was no other statute that passed it. That's correct. Unless the others have further questions, I thought it was all right. Thank you. Let me pick up on the statute of limitations on the domain. I don't think anyone disagrees that the legislative history of 1658A is clear that it served a very specific purpose, not mentioning bankruptcy, which was to fill in gaps in actions where there was a federal statute, and the federal statute didn't have a statute of limitations. Yeah, why isn't that this case? Because there's no statute of limitations that specifically applies to claims made under Section 541. There are two reasons. Just to heart break what you said, and I think you're incorrect, you said that the statute says unless another statute applies at the beginning of 1658, it doesn't refer to another statute. It says except as otherwise provided by law. It doesn't refer to another statute. Our argument, the first argument, leaving aside that I don't believe we're dealing with a civil action, that's the second argument. Put that aside. The first argument is that in 1990, there was other law, and for very good reason, as to estate property determinations, determining in bankruptcy for what is or is outside the estate. That's the Wiggins case, the Fontaine case that we've cited, where they say explicitly prior to 1990, these issues are not subject to any statute of limitation. And the Section 542 turnover cases say that in abundance, where it's a trustee turnover case. They say prior to 1990, it's a body of bankruptcy law that says statutes of limitation don't apply to the determination of whose property it is, the estate's or is it outside. There's a reason for that, and this case gives you the example. What happens in a bankruptcy court is not what happens when someone breaches a contract and the party has to sit there and think, okay, do I have six years? Do I have four years in a particular estate? Do I have six years? Am I mad enough? Is it a big enough case? That's a one versus the other plaintiff-defendant kind of case. But what the Wiggins, Fontaine, all the turnover cases under 542 are talking about is in bankruptcy, it's really a status of a body of money. The trustee isn't a natural adversary of any other particular person that might have an interest in it. All the creditors might have an interest. Outsiders might have an interest. The trustee has this multiple-layered role of being the fiduciary to the estate but also getting it right. And the process by which that happens is too generous, as I said, extensively in the briefs. In bankruptcy court, what happens is not what happens when somebody files a complaint, plaintiff-defendant discovery, Rule 26, Conference Rule 16. It doesn't happen that way. What happens is what happens here. They have a procedures order in 2009. They deal with the SIPA claims first until 2012. They raise this issue in 2015. And as I was – I didn't mean to interrupt, but as I think I was trying to say to you prior, it wasn't to say that we have an estoppel argument as such about that, but it reflects on why the existing law before 1990 in bankruptcy cases was clear that this is not where statutes of limitation make sense because what's going to happen is going to be determined by the character of the bankruptcy, the choices that the trustee makes, and it's always been that. That's why you don't have a case for 30 years invoking 1658A in a bankruptcy case because it just doesn't belong there. But that argument does not engage with the text of the statute. The statute says accept as provided by other law. It doesn't say accept as provided by other statute. If you disagree, I will lose. But it does say provided by other law, not an other law in the sense of an other statute, and I don't think the trustee has even argued that. So if I'm correct that the existing law in 1990 was – and the case is the same in so many words. The state property determinations are not subject to a statute of limitation. That was the existing law. And it's a matter of common sense. I mean, look at the mess of this 13 years. How can it make sense that 34, 144 individuals who at that time had no counsel in 2000 How could it make sense that we are here debating this issue now in 2021 when this court has already dealt with the point that these claims should be subordinated to everybody else's claims and held that it did and that we've got another appeal which precedes the one we're now talking about, our hearing in tandem with this, which was an argument about whether this was a secured claim. And these individuals have lost in the bankruptcy court, in the district court, in the court of appeals, in the bankruptcy court and the district court, and is now before us with respect to the it's kind of like a secured claim argument. And now we're here having lost in the bankruptcy court, and finally I guess everybody's lost patience and they decided to bring this here directly to argue this new version of their argument. That's what seems peculiar to me about why this has taken so long. It's not like this claim was sort of sitting there with no one paying attention to it while all this other stuff was going on. This case got, this claim got litigated in two other attempts to characterize it variously before the bankruptcy court, before it came to be this latest version. There are a couple of parts to the answer. I know I'm over time, but I mean this is critical and it's critical to 344 people who pretty much lost everything in their retirement, so I'm going to ask you to give me a couple of moments. Why we're here in 2015 in the most practical sense is that that's when the trustee raised it. Our clients had no counsel. Our clients had no counsel on that issue. Our appearance was limited to the other subordination issue, which did not litigate 541B7. 541B7 has never been litigated on the merits. We hope the merits can be reached. We've hardly had a chance to talk about them today, but we think the fact that there's a sea change in the trustees' position, I disagree with you. I think there's been a sea change in these individuals' position, not in the trustees' position. The argument was these are secured claims. The contention was no, they're not. They belong at the bottom of the pile. That got fought out. And to say that you were only retained to a limited basis to deal with the subordination issue, it's not a question of your retainer except insofar as that suggests that these clients did not choose to pursue this other way of approaching it, but instead litigated the subordination claim. But, Jeff, here's what happened. I sidetracked myself from it. I began to say this earlier. Mr. Fitzpatrick raised the question with me in 2015 about the way it proves the plaintiff's statement. Clearly they invoked 541B7. Nobody can say they didn't. The trustee can't say that they didn't. The trustee has to understand what that meant. Whether it's labeled secure or whether it should be an adversary proceeding that's outside the estate, that ought to be determined one way or the other. When they made their motion, we believe it was a defective motion. In 2015— Wait, you believe—I don't care what you believed as to whether it was a defective motion. It got litigated under that rubric all the way to this court. Now, I don't know whether you said then, this is a defective motion and therefore we shouldn't even be here. We did. But if you did, you lost, right? We did, and we appealed to Judge Gardefee, and four years later we got his decision. You appealed to Judge Gardefee, and then you appealed to this court. Right. By the time we were appealing to this court, we were the ones who had already raised with the trustee. We don't know what's going on for four years. In 2015, nobody could have imagined we wouldn't be either getting a decision that that procedural path was fine or else we would have to go a different route, which would be the adversary proceeding route. But it sat for four years in Judge Gardefee's court. Let me ask you this. Let me ask you this. Hold on. I'm about to ask you a question. There are suggestions in the briefs that this case, this matter, if you will, is the last remaining matter as a prelude to closing out this estate. Is that correct? No. We've explained why in our briefs. There are plenty of matters. All of that has come down to, I mean, I can… Anyway, there's more. This resolution of this problem will not end the Lehman Brothers' bankruptcy. What it is… Is that correct? As I understand it, the last… Is that correct? That is correct. The trustee has said to the bankruptcy court, if we get rid of this case, the many other matters, which were monitoring and collecting funds from, gosh, maybe we can close the estate and create some vehicle to deal with those, but they are substantial. Some of them are in the tens, hundreds of billions of dollars. It's not the last thing. Just as in 2015, when the sensible thing to do was to appeal the lack of a proper motion so we could put things on some kind of a track, nobody thought we'd be waiting two, three years for this… The time is up. The time is up. We've heard that argument a number of times now. Okay. Thank you for your argument, Mr. Patrick. Thank you for your argument. We'll reserve the decision.